**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TI NG,<br>19 Greenlawn Road<br>Cortlandt Manor, NY 10567<br><br>*Individually and on behalf of all others similarly situated*<br>*Plaintiff,*<br>v.<br><br>MEHRI & SKALET, PLLC<br>2000 K St NW, Suite 325<br>Washington, DC 20006<br>*Defendant.* | Case No. 1:25-cv-4452<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ti Ng ("Plaintiff"), individually and on behalf of other similarly situated individuals, by and through her undersigned attorneys, Federman & Sherwood, file this Class Action Complaint against Mehri & Skalet, PLLC ("M&S" or "Defendant") and allege the following based on personal knowledge, the investigation of counsel, and information and belief.

## NATURE OF THE ACTION

1. Plaintiff and other Class Members are individuals and current and former clients ("Clients") of Defendant who either entrusted or had their personally identifiable information ("PII") held by M&S. Defendant betrayed Plaintiff's trust by failing to properly safeguard and protect her PII and by disclosing her PII to cybercriminals.

2. This class action seeks to redress M&S's unlawful and negligent disclosure of Clients' PII in a massive data breach on December 17, 2024 ("Data Breach" or "Breach"), in violation of common law and in breach of express and implied contract.

3. For the rest of their lives, Plaintiff and the Class Members will bear an immediate and heightened risk of all manners of identity theft. Accordingly, Plaintiff brings this action as a

direct and/or proximate result of the Data Breach. Plaintiff has incurred and will continue to incur damages in the form of, *inter alia*, loss of privacy and/or the additional damages set forth in detail below.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members, at least one Class Member is a citizen of a state that is diverse from M&S, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

5. This Court has personal jurisdiction over Mehri & Skalet, PLLC because M&S maintains its principal place of business in Washington, DC.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains it principal place of business in the District and this District is one where a substantial part of the events or omissions giving rise to these claims occurred.

## PARTIES

7. Plaintiff Ti Ng is a resident of Cortlandt Manor, New York. Plaintiff received a letter from M&S informing her of the Data Breach on November 19, 2025. The letter informed Plaintiff that her name and social security number had been compromised in the Data Breach. A copy of the data breach notice letter received by Plaintiff is attached hereto as Exhibit 1 ("Data Breach Notification Letter"). Upon information and belief, Plaintiff's PII was compromised in the Breach and is therefore a victim of the Breach.

8. Defendant Mehri & Skalet, PLLC is a law firm and professional limited liability company (PLLC) organized under the laws of the state of the District of Columbia with its principal place of business in Washington, DC.

## FACTUAL BACKGROUND

### I. M&S's Data Breach and Communications to Clients

9. Mehri & Skalet, PLLC is an established law firm located in Washington, DC, and provides legal representation for employment law, civil rights, insurance & health, sports law, and consumer protection cases.[1]

10. On December 17, 2024, an unauthorized actor gained access to M&S's network and the PII of Plaintiff and Class Members, including names and social security numbers, stored thereon Exhibit 1. Upon information and belief, the unknown actor exfiltrated PII data from M&S network to use for nefarious purposes as that is the modus operandi of cybercriminals that breach companies' systems.

11. M&S became aware of this Data Breach on or about May 20, 2025. Exhibit 1.

12. Plaintiff was first notified of the Data Breach via letter dated November 19, 2025, almost *six months* after M&S became aware of the Data Breach. The letter stated that the PII that was accessed and downloaded by the unauthorized actor included Plaintiff's name and Social Security number.

13. Plaintiff is not aware of how M&S acquired her data.

14. In the letter sent to Plaintiff, M&S provided access to only one year of credit monitoring services with IDX. Exhibit 1.

15. The letter provided to Plaintiff provided minimal information on the nature of the breach stating only that an "unauthorized actor" accessed "employee's email account and downloaded information". Exhibit 1.

---

[1] *About Us,* Mehri & Skalet: https://findjustice.com/about-us/ (last visited Dec. 17, 2025).

16. In a sample letter filed with the Vermont Attorney General on November 19, 2025, M&S indicated that it was willing to provide up to two years of credit monitoring services to Class Members.

17. Now and for the rest of their lives, Plaintiff and Class Members are in imminent danger and risk of identity theft and fraud.

## II. Personally Identifiable Information (PII)

18. PII is of great value to hackers and cyber criminals, and the data compromised in this Data Breach can be used in a number of unlawful manners.

19. PII is information that can be used to distinguish, identify, or trace an individual's identity, such as the Social Security Number and biometric records. This can be accomplished with the PII disclosed alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, name, and mother's maiden name.[2]

20. Given the nature of this Data Breach, it is foreseeable that hackers and cyber criminals can and will sue the compromised PII in a variety of different ways.

21. Indeed, cyber criminals with Clients' PPI can easily obtain Clients' tax returns and/or file fraudulent tax returns in their names.

## III. M&S Was Aware of The Risk of Data Breaches.

22. Indicating knowledge of the potential for a data breach, in their Privacy Notice for their clients posted on their public website, Defendant asserts that they "will take all steps reasonably necessary to ensure that Your data is treated securely and in accordance with this Privacy Policy and no transfer of Your Personal Data will take place to an organization or a country

[2] OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n.1.

unless there are adequate controls in place including the security of Your data and other personal information..”[3] Despite acknowledging its obligations to implement proper security measures, Defendant failed to protect Plaintiff’s and Class Members’ PII from the Data Breach.

23. Whoever was the individual, individuals, or organizations who obtained the PII of Clients, they can use this PII for their own nefarious purposes or sell this data on so-called “dark markets.” Having obtained Clients’ Social Security Numbers and Names, the cybercriminals could commit a broad range of fraud including but not limited to: obtaining employment; obtaining a loan; applying for credit cards or spending money; filing fraudulent tax returns; obtaining medical care; and stealing government benefits.

24. Data security breaches have dominated the headlines for the last two decades. And it doesn’t take an IT industry expert to know it. The general public can tell the names of some of the biggest cybersecurity breaches: Target,[4] Yahoo,[5] Marriott International,[6] Chipotle, Chili’s, Arby’s,[7] and others.[8]

[3] Transfer of Your Personal Data, Mehli & Skalet (last visited Dec.8, 2025), https://findjustice.com/privacy-policy/

[4] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[5] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[6] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last visited Oct. 9, 2023).

[7] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018, 12:58 PM), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[8] *See, e.g.*, Michael Hill and Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Nov. 8, 2022), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

25. The number of data breach victims has surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[9]

26. M&S should certainly have been aware, and indeed were aware, that they were at risk of a data breach that could expose the PII that it collected and maintained.

27. M&S was clearly aware of the risks they were taking and the harm that could result from inadequate data security but threw caution to the wind.

28. As a custodians of Private Information, M&S knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

29. Despite the prevalence of public announcements of data breach and data security compromises, M&S failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

30. Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

[9] https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/.

## IV. M&S Failed to Comply with FTC Standards and Guidelines.

31. Data breaches are preventable.[10] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[11] he added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[12]

32. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[13]

33. In a data breach like this, many failures laid the groundwork for the Breach.

34. The FTC has published guidelines that establish reasonable data security practices for businesses.

35. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[14]

---

[10] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[11] *Id.* at 17.
[12] *Id.* at 28.
[13] *Id.*
[14] *Protecting Personal Information: A Guide for Business*, FTC, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

36. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.

37. The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

38. According to information and belief, Defendant failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines.

39. Upon information and belief, Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

40. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[15]

41. To prevent the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

---

[15] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[16]

42. Given that Defendant was storing the PII of hundreds, if not thousands, of individuals, Defendant could have and should have implemented all of the above measures to prevent and detect cyberattacks, however, Defendant failed to do so.

43. Significantly, among other failures, Defendant had far too much confidential unencrypted information held on its systems. Such PII should have been segregated into an encrypted system.[17]

44. Moreover, it is a well-established industry standard practice for a business to dispose of confidential PII once it is no longer needed.

45. The FTC, among others, has repeatedly emphasized the importance of disposing unnecessary PII, saying simply: "Keep sensitive data in your system only as long as you have a

[16] *Id.* at 3–4.

[17] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[18] Defendant, rather than following this basic standard of care, kept thousands of individuals' unencrypted PII indefinitely.

46. In sum, the Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all PII.

47. M&S failed to follow FTC guidelines and industry standards for safeguarding and protecting the PII of Plaintiff and Class Members against unauthorized disclosures to third parties.

48. Further, the scope of the Data Breach could have been dramatically reduced had Defendant utilized proper record retention and destruction practices.

49. M&S owed a duty of care to protect Plaintiff's and Class Members' PII using the recommendations and mandates of the FTC, but M&S failed to follow FTC guidelines and as a result, an unauthorized third party was able to access and exfiltrate PII from M&S systems. As a result of M&S negligence in implementing security safeguards in accordance with the FTC, Plaintiff and Class Members were injured and now face imminent impending risk of fraud and identity theft for the rest of their lives. Plaintiff's and Class Members' injuries were proximately caused by M&S negligence in protecting their PII.

## V. M&S's Current and Former Clients Have Suffered Concrete Injuries

50. M&S is a law firm based in Washington, DC, that lists its practice areas as employment law, civil rights, whistleblowers, insurance & health, sports law, consumer protection and consulting.[19]

---

[18] *Protecting Personal Information: A Guide for Business*, FTC, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.

[19] Practice Areas, Mehli & Skalet (last visited Dec. 8, 2025), https://findjustice.com/practice-areas/

51. Clients were obligated to provide M&S with sensitive personal information, sometimes including their Social Security Number. Others, such as Plaintiff, do not recall *ever* providing their PII to M&S.

52. The cybercriminals will certainly use the Clients' PII, and the Clients are now, and will be for the rest of their lives, at a heightened risk of identity theft. Plaintiff brings this action because as a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff has incurred and will continue to incur damages in the form of, *inter alia,* attempted identity theft, time and expenses mitigating harms (*e.g.*, the costs of engaging credit monitoring and protection services), increased risk of harm, diminished value of PII, and/or loss of privacy. By this action, Plaintiff seeks to hold M&S responsible for the harm caused by its negligence.

53. Plaintiff greatly values her data privacy. This is why she was startled to learn of the Data Breach upon receipt of the letter sent to her by M&S. Plaintiff does not recall ever transacting with M&S in any way, much less providing them with sensitive PII. Upon learning about the Data Breach, Plaintiff immediately went to the bank to close off any access using her social security number and freeze her account, spending a great deal of time to do so.

54. Due to the Data Breach and the resulting concerns stemming from the compromise of her PII, Plaintiff spent money buying Aura, a top identity theft protection service. She then lost multiple hours on the phone with the company ensuring that her data was secured.

55. In addition, as a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market. For example, stolen PII is sold on the cyber black market for $1 and $4000 depending

what information has been stolen, to individuals focused on committing fraud or needing or wanting a new identity.[20]

56. Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[21] Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[22] Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[23] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. There is also a high probability that criminals who now possess Plaintiff's and the other Class Members' PII have not yet used the information but will do so at a later date or re-sell it.

**VI. M&S's Response to The Data Breach Is Inadequate to Protect the Clients**

57. M&S has failed to provide adequate compensation to the Clients harmed by its negligence. To date, M&S has offered Plaintiff only one year of credit monitoring services. According to the sample letter filed with the Vermont Attorney General, the maximum provided by M&S is two years of credit monitoring through IDX.

---

[20] Ben Luthi, Here's What Your Data Sells for on the Dark Web, Experian (Jun. 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[21] Data Breach Victims More Likely To Suffer Identity Fraud, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), http://www.iii.org/insuranceindustryblog/?p=267.

[22] Susan Ladika, Study: Data Breaches Pose A Greater Risk, CREDITCARDS.COM (July 23, 2014), http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php.

[23] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH-IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, (available at http://www.nclnet.org/datainsecurity_report).

58. Even for Clients who do accept the credit monitoring, this service will not provide Clients any compensation for the costs and burdens associated with fraudulent activity resulting from the Data Breach that took place prior to a client signing up for these services.

59. Plaintiff and Class Members could have enrolled in credit monitoring, could have instituted credit freezes, and could have changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

60. Plaintiff and Class Members have suffered harm from the delay in notifying them of the Data Breach.

61. As a direct and proximate cause of Defendant's conduct, including but not limited to its failure to implement and maintain reasonable security practices and procedures, Plaintiff and Class Members have suffered, as Plaintiff have, and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and

adequate measures to protect the Private Information of employees in its continued possession; and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

62. The damages Plaintiff and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's negligent conduct.

63. Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

**VII. Plaintiff's Experience.**

64. Upon information and belief, M&S was in possession of Plaintiff's Private Information before, during, and after the Data Breach.

65. Plaintiff received a Notice Letter of the Breach dated November 19, 2025.[24]

66. Because of the Data Breach, there is no doubt Plaintiff Green's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Green and the Class are at an imminent risk of identity theft and fraud.

67. As a result of the Data Breach, Plaintiff estimates she has already expended hours of her time mitigating the harms of the Data Breach and will need to do so on a weekly basis. As such, Plaintiff has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including

[24] Ex. 1

investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

68. Plaintiff places significant value on the security of her Private Information and does not readily disclose it. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

69. Upon information and belief, Plaintiff has noticed a significant uptick in spam emails, phone calls, and text messages which she did not receive prior to the Breach.

70. Plaintiff has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm to Plaintiff and the Class by offering temporary, non-automatic credit monitoring services to Plaintiff and the Class.

71. Knowing that thieves intentionally targeted and accessed his Private Information, including her Social Security number, has caused Plaintiff great anxiety beyond mere worry.

72. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing him of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

73. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

74. Plaintiff has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of her valuable Private Information; (ii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iii) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (v) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

## CLASS ACTION ALLEGATIONS

75. Pursuant to FED. R. CIV. P. 23, Plaintiff brings this action against M&S as a class action on behalf of herself and all members of the following class of similarly situated persons (the "Class" or "Class Members"):

"All persons whose PII was compromised as a result of the Data Breach."

76. Plaintiff reserves the right to amend the above definition, or to propose other or additional classes, in subsequent pleadings and/or motions for class certification.

77. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant have or had a controlling interest, or which Defendant otherwise controls or controlled; and any legal representative, predecessor, successor, or assignee of Defendant.

78. This action satisfies the requirements for a class action under Rule 23.

79. Plaintiff based on information and belief that the proposed Class as described above consists of at least hundreds of members and can be identified through M&S's records, though the exact number and identities of Class members are currently unknown. The Class is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

80. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class Members. Common questions include, but are not limited to, the following:

- Whether and to what extent M&S had a duty to protect the Class Members' PII.
- Whether M&S breached its duty to protect the Class Members' PII.
- Whether M&S disclosed Class Members' PII.
- Whether M&S timely, accurately, and adequately informed Class Members that their PII had been compromised.
- Whether M&S's conduct was negligent; and
- Whether Plaintiff and Class Members are entitled to damages.

81. The claims asserted by Plaintiff are typical of the claims of the Members of the Class she seeks to represent because, among other things, Plaintiff and Class Members sustained similar injuries as a result of M&S's uniform conduct; M&S owed the same duty to each Class Member; and Class Members' legal claims arise from the same conduct by M&S.

82. Plaintiff will fairly and adequately protect the interests of the proposed Class. Plaintiff's interests do not conflict with the Class Members' interests. Plaintiff has retained class counsel experienced in class action litigation to prosecute this case on behalf of the Class.

83. Prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant.

84. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually. Trial of Plaintiff and Class Members' claims on a class basis, however, is manageable. Unless the Class is certified, Defendant will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

85. Certification of the Class, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

86. Certification of the Class is also appropriate under FED. R. CIV. P. 23(b)(2) because M&S has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or equitable relief with respect to the Class as a whole.

87. Certification of the Class is also appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for M&S.

88. M&S's wrongful actions, inaction, and omissions are generally applicable to the Class as a whole and, therefore, Plaintiff also seeks equitable remedies for the Class.

89. M&S's systemic policies and practices also make injunctive relief for the Class appropriate.

90. Absent a class action, M&S will retain the benefits of its wrongdoing despite its serious violations of the law and infliction of economic damages, injury, and harm on Plaintiff and Class Members.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

91. Plaintiff re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

92. Plaintiff brings this claim on behalf of herself and the Class.

93. To perform its legal services, Defendant collects Plaintiff's and Class Members' PII from its clients.

94. M&S had full knowledge of the sensitivity of the PII and the type of harm that Plaintiff and the Class could and would suffer if the PII was wrongfully disclosed. M&S had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information. Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the other Class Members had no ability to protect their data that was in M&S's possession

95. M&S had a duty to Plaintiff and Class Members to safeguard and protect their PII. M&S's duty to the Plaintiff and other Class Members included, *inter alia*, establishing processes and procedures to protect the PII from wrongful disclosure and training clients who had access to the PII as to those processes and procedures.

96. Defendant assumed a duty of care to use reasonable means to secure and safeguard this PII, to prevent its disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems.

97. Defendant had a duty to use ordinary care in activities from which harm might be reasonably anticipated in connection with Clients' PII data.

98. Defendant breached its duty of care by failing to secure and safeguard the PII of Plaintiff and Class Members. Defendant negligently stored and/or maintained its systems.

99. Further, Defendant, by and through its above negligent actions and/or inaction, further breached its duties to Plaintiff and Class Members by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols for safeguarding and protecting Plaintiff's and Class Members' PII within its possession, custody, and control. M&S admitted that Plaintiff's and the other Class Members' PII was wrongfully disclosed as a result of the Data Breach.

100. Plaintiff and the other Class Members have suffered harm as a result of Defendant's negligence. These victims' loss of control over the compromised PII subjects each of them to a greatly enhanced risk of identity theft, fraud, and myriad other types of fraud and theft stemming from use of the compromised information.

101. It was reasonably foreseeable -- in that Defendant knew or should have known -- that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII would result in its release and disclosure to unauthorized third parties who, in turn, wrongfully used such PII or disseminated it to other fraudsters for their wrongful use and for no lawful purpose.

102. But for Defendant's negligent and wrongful breach of its responsibilities and duties owed to Plaintiff and Class Members, their PII would not have been compromised.

103. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class Members' PII, Plaintiff and the Class Members have incurred (and will continue to incur) the above-referenced economic damages, and other actual injury and harm -- for which they are entitled to compensation. Defendants' wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

104. Plaintiff and Class Members are entitled to injunctive relief as well as actual and punitive damages.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

105. Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

106. Plaintiff and the Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect their Private Information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised. In exchange, Plaintiff and Class Members provided their Private Information to Defendant for services.

107. Plaintiff and the Class were required to, and delivered, their Private Information to Defendant as part of the process of obtaining services.

108. Plaintiff and Class Members conferred a monetary benefit on Defendant in that Plaintiff were required to pay Defendant for services, a portion of which should have been specifically allocated towards adequate data security.

109. Without the Private Information provided by Plaintiff and Class Members, Defendant could not derive revenue from its regular business activities. A portion of the revenue derived from the services and employment provided to Plaintiff and Class Members was to be used to provide a reasonable level of data security and reasonable data security practices. The amount of revenue to be allocated to data security is known to Defendant.

110. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services and implicitly agreed to protect their Private Information from data breaches and keep it confidential and secured.

111. The implied promise included consideration beyond those pre-existing general duties owed under state and federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines and industry standards on data security.

112. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its agents is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the Private Information against data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

113. Based on this implicit understanding, Plaintiff and Class Members accepted Defendant's offers and provided Defendant with their Private Information to obtain services.

114. Plaintiff and Class Members would not have permitted their Private Information to be collected and stored by Defendant had they known that Defendant would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

115. Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

116. Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

117. Upon information and belief, Defendant has not provided Plaintiff and the Class with information regarding the root cause of the Data Breach and the steps Defendant is taking to ensure that the Private Information remains safe and protected from further disclosures.

118. The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

119. Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

120. Plaintiff brings this claim in the alternative to her breach of contract claim.

121. M&S, by way of its affirmative actions and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on data security measures to secure Plaintiff's and Class Members' PII.

122. Instead of providing for a reasonable level of security that would have prevented the disclosures, consisting of firewalls, data security trainings, and PII retention and destruction policies and procedures -- as is common practice among companies entrusted with such sensitive personal information – M&S instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff and Class Members.

123. Nevertheless, M&S continued to obtain the benefits conferred on it by Plaintiff's and Class Members' employment, mainly from the labor contracted to in the employment agreements between the parties.

124. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result. As a result of M&S's decision to profit rather than provide requisite security, and M&S's resultant disclosures of its Clients' PII, Plaintiff and Class Members suffered and continue to suffer considerable injuries in the forms of attempted identity theft, time and expenses mitigating harms, diminished value of PII, loss of privacy, and increased risk of harm.

125. Thus, M&S engaged in an opportunistic material breach of contract, wherein it profited from interference with Plaintiff's and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit M&S to retain the benefits it derived as a consequence of its breach.

126. Accordingly, Plaintiff, on behalf of herself and the Class Members, respectfully requests this Court award relief in the form of restitution and/or compensatory damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully request that the Court grant relief against Defendant as follows:

- For an Order certifying the proposed Class pursuant to FED. R. CIV. P. 23(b)(1), (2) and/or (3), requiring notice thereto to be paid by Defendant, and appointing Plaintiff and her counsel to represent the Class.
- For appropriate injunctive relief and/or declaratory relief, including an Order requiring Defendant to immediately secure and fully encrypt all confidential information, to properly secure computers containing confidential information, to cease negligently storing, handling, and securing its clients' confidential information, and to provide identity theft monitoring for an additional five years.
- Adjudging and decreeing that Defendant has engaged in the conduct alleged herein.
- For compensatory, statutory, and general damages according to proof on certain causes of action.
- For reimbursement, restitution, and disgorgement on certain causes of action.
- For both pre- and post-judgment interest at the maximum allowable rate on any amount awarded.
- For costs of the proceedings herein.
- For an Order awarding Plaintiff and the Class reasonable attorney's fees and expenses for the costs of this suit; and
- For any and all such other and further relief that this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands trial by jury of all claims and causes of action in this lawsuit to which she is so entitled.

Dated: December 19, 2025,

Respectfully submitted,

*/s/ David K. Lietz*
David K. Lietz
**MILBERG PLLC**
5335 Wisconsin Ave. NW, Suite 440
Washington, DC 20015
Phone: 866.252.0878
dlietz@milberg.com

William B. Federman (*pro hac vice* forthcoming)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
Tel.: (405) 235-1560
wbf@federmanlaw.com

*Attorneys for Plaintiff and the Proposed Class*